**UNITED STATES of America,
Appellee,**

v.

**KENNECOTT COPPER
CORPORATION,
Appellant.**

No. 74–3401.

United States Court of Appeals,
Ninth Circuit.

Sept. 24, 1975.

Philip E. Von Ammon (argued), of Fennemore, Craig, Von Ammon & Udall, Phoenix, Ariz., for appellant.

John F. Flynn, Asst. U. S. Atty. (argued), Phoenix, Ariz., for appellee.

## OPINION

Before TUTTLE,* HUFSTEDLER and WRIGHT, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Kennecott Copper Corporation ("Kennecott") appeals from its conviction for violating 33 U.S.C. § 1321(b)(5) (failure immediately to notify an appropriate governmental agency of known oil spill). Kennecott challenges the constitutionality of the statute on due process grounds, argues that the evidence was insufficient to sustain the conviction, and asserts prejudicial error in claimed prosecutorial misconduct. We reject the contentions and affirm.

Sometime during the night of November 30, 1973, a pipeline broke at Kennecott's Arizona facility and 173,800 gallons of diesel oil spilled. The oil initially flowed to a pond 2 miles from the break. The pond was connected by a 100-yard channel to the Gila River. Mortimer and Fitch, supervisorial employees of Kennecott, were called to the site early on the morning of December 1. They found that workmen had blocked off the pond to prevent its draining into the channel. They ordered additional damming. Mortimer and Fitch then looked for signs of oil in and along the River. Each testified that he saw no sign of oil on December 1, although Mortimer said he could smell oil at the River then. The next day they tried further sightings downstream. Each testified to seeing "three or four rainbow-colored patches the size of the palm of a hand." Fitch examined the River again that night (December 2) after he had heard a rumor that a horse crossing the River had oil on its legs. He said that he could not see any oil then nor did he see any on the morning of December 3. At 1:20 p. m., December 3, Mortimer telephoned

* Honorable Elbert P. Tuttle, Senior Circuit Judge of the Fifth Circuit sitting by designation.

the ("Environmental Protection Agency") office in San Francisco to report a possible discharge of oil into the Gila River. Measurements of the spill were taken later from which it was determined that 24,000 gallons of the 173,800 gallons spilled had been recovered; the remainder apparently was lost in the ground and in the river. Water samples downstream from the pond contained oil from the spill.

Section 1321(b)(5), in pertinent part, provides:

> "Any person in charge of . . . an onshore facility . . . shall, as soon as he has knowledge of any discharge of oil . . . from such . . . facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined . . . ."

The pertinent provisions of paragraph (3) provide:

> "The discharge of oil . . . into or upon the navigable waters of the United States . . . in harmful quantities as determined by the President under paragraph (4) of this subsection, is prohibited . . . ."

Paragraph (4) says:

> "The President shall by regulation, to be issued as soon as possible after October 18, 1972, determine for the purposes of this section, those quantities of oil . . . the discharge of which, at such times, locations, circumstances, and conditions, will be harmful to the public health or welfare of the United States . . . ."

■ Kennecott argues that section 1321(b)(5) is void for vagueness because the statute and its referents fail adequately to define "harmful quantities," "immediately," and "appropriate govern-ment agency." We think that these terms are adequate to notify persons in charge of onshore oil facilities that their failure promptly to notify a governmental agency concerned with navigable waters or environmental protection about a substantial oil spill will subject them to potential criminal liability. The terminology is neither highly technical nor obscure. The language is well within due process limits. (*See Connally v. General Construction Co.* (1926) 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322.)

■ Kennecott's vagueness argument is not based on that common sense reading of the statute. It argues that the statute beclouds itself by referring to a complex regulatory scheme, including a presidential directive to define "harmful quantities" that was not timely promulgated. The immediate statutory predecessor of 33 U.S.C. § 1321(b)(3)–(5) was former 33 U.S.C. § 1161(b)(2)–(4). The language of present section 1321(b)(5) challenged for vagueness is identical to the provisions of section 1161(b)(4), which we upheld against that very charge in *United States v. Boyd* (9th Cir. 1973) 491 F.2d 1163. The citation to *Boyd* would end the matter but for the wrinkle that the Administrator of the EPA, to whom the President, under 33 U.S.C. § 1321(b)(4), had delegated his duty to define "harmful" (Exec. Order No. 11,735, 38 Fed.Reg. 21243 (1973)), did not promulgate the implementing definitions until after this oil had spilled. This lapse gives some plausibility to Kennecott's argument that the statute is unfinished and thus vague. The argument fails because the old definitions of harmfulness promulgated under former 33 U.S.C. § 1321, as amended in 1972, 33 U.S.C. § 1251 (Supp.1974) saved "All rules, regulations, orders, determinations . . . delegations or other actions duly issued . . . pursuant to the Federal Water Pollution Control Act [33 U.S.C. §§ 1151 *et seq.*, including § 1161]" and continued them "in full force and effect . . . until modified or rescinded in accordance with the Federal

Water Pollution Control Act as amended by this Act." In short, this statute gave continued life to the regulations that we considered in *Boyd* until new ones were promulgated, and no hiatus exists.

■ Kennecott tries to avoid the result by arguing that the savings clause continuing the old regulations directly conflicts with the language of section 1321(b)(4) stating that "harmful quantities" shall be defined "as soon as possible after October 18, 1972." We see no conflict. Certainly Congress wanted new regulations drafted "as soon as possible," but it manifested no intent to void existing regulations while awaiting a new set, nor did it suggest that administrative tardiness would have any impact on the effectiveness of the new statute as read with the old, saved regulations.

■ Kennecott vigorously argues that the statute and regulations should be struck down because the statutory scheme is too complex and the reference to "appropriate agency" is too indefinite to give adequate notice. We are not convinced. Executive Order No. 11,735 is not hard to find, and the order itself cites the relevant sources of definitions. The statutory scheme is not unduly labyrinthine; indeed, it is simple as compared with some other statutory schemes carrying criminal penalties, such as the federal income tax statutes and regulations. (*See Lambert v. California* (1957) 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228.)

■ We read the term "the appropriate agency of the United States" as encompassing any federal agency concerned with water and environmental pollution or navigable waters. That interpretation is consistent with the applicable regulations specifically defining the persons and agencies to be notified of oil spills. (33 C.F.R. § 153.105; *cf. United States v. Boyd*, supra, 491 F.2d 1163.) Mortimer's call to the EPA office, reporting the spill, would have satisfied Kennecott's statutory obligation if the call had been made reasonably promptly, such as Saturday morning, December 1, and not the following Monday afternoon.

■ The evidence was sufficient to sustain the verdict. In *Boyd*, we upheld the conviction of a ship captain who failed promptly to report the discharge of about 30 gallons of diesel oil from his vessel into a waterway. Here, the jury had evidence from which it could properly have concluded that Kennecott spilled over 100,000 gallons of oil into the Gila. It did not have to believe the testimony of Mortimer and Fitch that the oil slicks that they saw were a few the size of a palm print. The jury had ample evidence before it to charge Kennecott with knowledge that harmful quantities of oil had been accidentally discharged into the Gila.

■ No prosecutorial misconduct occurred. Kennecott claims misconduct in the prosecutor referring in closing argument to the existence of constant telephone service to reporting agencies. Contrary to Kennecott's assertion, evidence had been introduced to support the availability of 24-hour telephone answering services for the Coast Guard Offices in Phoenix and in Washington, D.C. Whether or not the San Francisco EPA office had similar service is not relevant because it was not the only appropriate agency and because Kennecott offered no evidence that it had tried to report the spill to any agency until it successfully notified EPA on the afternoon of December 3.

Affirmed.