UNITED STATES of America,
Plaintiff–Appellee,

v.

Allen ELIAS, Defendant–Appellant.

No. 00–30145.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 2001

Filed Oct. 23, 2001

As Amended Dec. 21, 2001.

Scott A. Schumacher, John M. Colvin, and Darrell D. Hallett (argued), Chicoine & Hallett, P.S., Seattle, Washington, for the defendant-appellant.

Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, Betty Richardson, United States Attorney, and Jeffrey C. Dobbins (argued),

Attorney, United States Department of Justice, for the plaintiff-appellee.

Before: WALLACE, HALL, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

After a three-and-a-half-week trial, a jury convicted Allen Elias of four offenses, the most serious of which was disposing of hazardous waste without a permit, knowing that his actions placed others in imminent danger of death or serious bodily injury in violation of 42 U.S.C. § 6928(e). Elias appeals on numerous grounds. We address several of them here and the remainder in a memorandum disposition filed contemporaneously.

## I.

## BACKGROUND

### A. *Offense Conduct*

Allen Elias owned Evergreen Resources, a fertilizer company located near Soda Springs, Idaho. In August 1996, Elias decided to transfer sulfuric acid from two railroad cars into a stationary 25,000–gallon tank that he had transported to Evergreen from his previous business, AEI.

At AEI, Elias had used the thirty-six-foot-long, eleven-foot-high tank as a storage tank for byproducts of a cyanide leaching process he had patented. Elias realized that his process resulted in the transfer of cyanide-laced solids into the tank. He admitted, moreover, that there were one to two tons of cyanide-laced sludge left in the tank when he shipped it to Evergreen in the early 1990s. This sludge did not preclude Elias from using the tank for some purposes. In 1996, however, Elias decided that the sludge, which was hardened and more than a foot deep, had to be cleaned out of the tank before he could store the sulfuric acid in it.

On August 26, 1996, Elias ordered four of his employees, Bryan Smith, Gene Thornock, Darrin Weaver, and Scott Dominguez, to enter the tank and wash the sludge out a valve opening in the end. Despite Smith's repeated requests, Elias failed to provide any safety equipment for this task. Consequently, Dominguez and Weaver entered the tank wearing only their regular work clothes. After about fifteen minutes, they realized that the sludge could not be washed out the small hole in the end of the tank, and they exited. Both complained of sore throats and nasal passages.

The next morning, on August 27, 1996, Elias met with his employees, who told him of the difficulties of the day before and the health effects they suffered. Smith again insisted on the necessary safety equipment. Elias said he would get it, but told his employees to proceed anyway and that he expected the tank to be cleaned out that morning. Although he instructed his employees to "do it by the book," Elias provided none of the safety equipment or training needed for them to do so.

After cutting a bigger hole in the end of the tank, Dominguez and Weaver again entered the tank with no safety equipment. About 45 minutes later, after they had emptied about one-third of the sludge through the hole onto the ground, Weaver shouted that Dominguez had collapsed. Thornock and Smith unsuccessfully tried to get Dominguez out of the tank, which had only a 22–inch manhole at the top. When firefighters got to Dominguez, he was in severe respiratory distress and in danger of dying.

After extricating Dominguez, the fire chief asked Elias whether cyanide could be in the tank. Elias insisted that he had no knowledge of anything in the tank other than water and sludge, which the fire chief understood to mean mud.

After Dominguez was rushed to the hospital in Soda Springs, the treating physician there concluded that the most likely cause of his condition was cyanide poisoning. He called Elias and asked him whether there was a possibility that there was cyanide in the tank, to which Elias again replied no. The doctor nonetheless asked the LifeFlight helicopter from Pocatello to bring a cyanide antidote kit to Soda Springs. After the doctor administered it, Dominguez responded positively. Blood drawn while Dominguez was in the Soda Springs hospital revealed extremely toxic levels of cyanide in his body.

The day Dominguez was injured Elias told investigators that he had completed a confined space entry permit, although it was "handwritten" and "not very formal." He declined, however, to actually provide the permit to investigators at that time. Early the next morning, Elias visited an acquaintance at a nearby company, Kerr–McGee Corp., where he inquired about the requirements for confined space entries and departed with a copy of Kerr–McGee's safety manual, which spelled out the requirements for a confined space entry permit. The permit Elias eventually provided investigators stated that it was issued on August 27, 1996, at 10:30 am.

Weeks after Dominguez was injured, Elias ordered a new employee to move and bury the same sludge, again without safety precautions.

### B. *District Court Proceedings*

Based on this conduct, a grand jury returned a four-count indictment against Elias. In Count I, the indictment charged that Elias had stored or disposed of hazardous waste without a permit, knowing that his actions placed others in imminent danger of death or serious bodily injury in violation of 42 U.S.C. § 6928(e), the Resource Conservation and Recovery Act ("RCRA"). Counts II and III, which stemmed from events that transpired after Dominguez was injured, charged him with improper disposal of hazardous waste without a permit in violation of 42 U.S.C. § 6928(d). Count IV charged Elias with a violation of 18 U.S.C. § 1001 for making material misstatements relating to the confined space entry permit that he alleged was prepared on August 27, 1996. On May 7, 1999, the jury convicted Elias on all four counts.

In June 1999, prior to sentencing, counsel for the Government spoke with Boyd Greenlee, the jury foreperson. Greenlee told them that Elias had spoken to one of the alternate jurors and asked what it would take to get him off. Counsel for the Government apprized both the court and Elias's counsel of Greenlee's revelation, causing a full evidentiary inquiry to ensue. In October 1999, Elias moved for a new trial based on juror bias and perceived jury tampering. The district court denied Elias's motion, having concluded, based on two evidentiary hearings, that because everyone involved thought the incident was a joke, no risk of bias infected the jury's deliberations.

In October 1999, Elias also moved to dismiss the three RCRA counts in his indictment, asserting that the United States had ceded its criminal enforcement authority to the State of Idaho when the Environmental Protection Agency ("EPA") authorized it to manage a hazardous waste program under RCRA. Initially, the district court agreed in part and granted Elias's motion to dismiss Counts II and III. As a result of both parties' motions for

reconsideration, the district court reversed its earlier ruling and reinstated Counts II and III. The district court held, however, that those counts should be amended in order to list Idaho law rather than federal law as a basis for the charges.

On April 28, 2000, the district court sentenced Elias to 204 months in prison and ordered him to pay $6.3 million in restitution. Elias appeals.

## II.

## ANALYSIS

### A. *Federal Enforcement of RCRA's Criminal Sanctions*

■ Elias argues that Counts I, II, and III of his indictment must be dismissed because they alleged[1] federal RCRA violations, and when the EPA authorized Idaho's hazardous waste program, that program replaced and supplanted federal RCRA law, effectively stripping the United States of enforcement authority. Elias derives support for his argument from 42 U.S.C. § 6926. That section, which governs "Authorized State hazardous waste programs,"[2] provides in relevant part:

> Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and ... submit to the [EPA] Administrator an application ... for authorization of such program.... [If the Administrator approves the program,]

[s]uch State is authorized to carry out such program in lieu of the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste....[3]

■ Because Idaho's hazardous waste program was concededly EPA-authorized at all relevant times, the crucial sentence for our purposes is the second one: "Such State is authorized to carry out such program in lieu of the Federal program under this subchapter...."[4] Our task is to reconcile this "in lieu of" language with the language of 42 U.S.C. § 6928, the RCRA "Federal enforcement" provision enacted the same year. As its title implies, § 6928 authorizes federal criminal and civil enforcement and penalties.[5]

Elias argues that, pursuant to § 6926, Idaho's authorized hazardous waste program displaced the federal program, leaving no federal crimes and ousting the federal court of jurisdiction. The linchpin of this argument, which the First Circuit flatly rejected in *United States v. MacDonald & Watson Waste Oil Co.*,[6] "is that the term 'program' in § 6926 incorporates the exclusive responsibility to enforce criminal provisions penalizing the disposal of hazardous wastes."[7] Because construing RCRA in this manner contravenes *Chevron*'s[8] dictates as well as RCRA's plain language and legislative history, we reject Elias's argument.

---

1. As noted above, the district court ordered post-trial that the indictment be amended to reflect violations of Idaho law.

2. 42 U.S.C. § 6926.

3. 42 U.S.C. § 6926(b).

4. *Id.*

5. The portions of 42 U.S.C. § 6928 relevant to this appeal are reproduced in the appendix to this opinion.

6. 933 F.2d 35 (1st Cir.1991).

7. *Id.* at 44.

8. *Chevron, USA, Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

This case bears a striking resemblance to *Wyckoff Co. v. EPA*.[9] The *Wyckoff* defendants unsuccessfully sought to enjoin the EPA from bringing a civil enforcement act against them. On appeal, they argued that because § 6926 "authorizes state programs to be carried out 'in lieu of the Federal program,' Congress intended to revoke the EPA's power to issue [civil compliance orders] where an authorized state program is in effect."[10] We rejected that contention, noting that the EPA did not interpret RCRA to cede exclusive enforcement authority to states and that, under *Chevron*, "[i]f the EPA's interpretation of [§ 6926's 'in lieu of' provision] is reasonable, we must defer to the agency's interpretation even if the agency could also have reached another reasonable interpretation, or even if we would have reached a different result had we construed the statute initially."[11] We concluded that the EPA's interpretation was reasonable because we could "discern no clear congressional intent that [§ 6926] be read to disable the EPA from issuing orders under [§ 6934][12] wherever an authorized state hazardous waste program operates 'in lieu of the Federal program'"[13] and because "[t]he EPA's conclusion that its power to issue orders under [§ 6934] survives in

those states where an authorized state program is operating is plainly consistent with a straightforward reading of the Act."[14]

*Wyckoff* controls here. But even if it did not, we would arrive at the same conclusion the second time around. As District Judge Timlin cogently argued in *United States v. Flanagan*,[15] § 6928's plain text supports the EPA's interpretation that its enforcement power survives authorization of state programs:

> Section 6928(a) allows the EPA to exercise civil enforcement powers even where a state program is in effect. This demonstrates "that Congress did not intend, by authorizing a state program 'in lieu of a Federal program,' to preempt federal regulation entirely." Similarly, Congress intended other criminal enforcement provisions of Section 6928(d) to survive authorization of state programs, which at least indicates a general congressional intent to maintain Federal involvement in criminal enforcement post-authorization. *See* Section 6928(d)(3), (4) & (5) (criminalizing noncompliance with "regulations promulgated by the Administrator (or by a State

9. 796 F.2d 1197 (9th Cir.1986).

10. *Id.* at 1199.

11. *Id.* at 1200 (internal quotation omitted).

12. A Section 6934 gives the EPA the authority to order the owner or operator of a facility to conduct "monitoring, testing, analysis, and reporting" so the EPA can ascertain the nature and extent of hazards posed by certain hazardous waste facilities. 42 U.S.C. § 6934(a)(2).

13. *Wyckoff*, 796 F.2d at 1200.

14. *Id.* at 1201. Here, as in *Wyckoff*, the EPA's interpretation is abundantly clear. The EPA rule authorizing Idaho's program states

that "[t]he Agency retains the authority under [§ 6928] of RCRA to undertake enforcement actions in authorized states," and that "[w]ith respect to such enforcement action, the Agency will rely on Federal sanctions, Federal inspection authorities . . . rather than the authorized State analog to these requirements. Therefore, the Agency does not intend to codify such authorized Idaho enforcement authorities." Hazardous Waste Management Program Codification of Approved State Hazardous Waste Program for Idaho, 55 Fed. Reg. 50327–01 (December 6, 1990).

15. 126 F.Supp.2d 1284 (C.D.Cal.2000). Like Elias, the *Flanagan* defendants were indicted for criminal RCRA violations including treating or storing hazardous waste without a permit. *Id.* at 1285.

in the case of an authorized State program) under this subchapter.").[16]

In support of his contrary conclusion, Elias cites the Eighth Circuit's decision in *Harmon Industries, Inc. v. Browner.*[17] *Browner*'s statement that "[t]he plain 'in lieu of' language contained in the RCRA reveals a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects including enforcement" lends credence to his argument.[18] Reliance on *Browner,* however, is suspect. In *Browner,* the EPA sought civil penalties against the defendant. While its administrative enforcement action was pending, a state court approved a consent decree between the state and the defendant releasing the defendant from any claim for monetary penalties.[19] The district court held that this release was binding upon the EPA because the state was authorized pursuant to § 6926(b) to operate its own program and because " '[a]ny action taken by a State under a hazardous waste program authorized under [RCRA] [has] the same force and effect as an action taken by the [EPA] under this subchapter.' "[20]

The Eighth Circuit agreed.[21] We agree with *Flanagan,* however, that "*Browner* is not about if, but about when, the United States can bring a civil enforcement action in federal court after it has authorized a state program."[22] Even *Browner* conceded that "[RCRA] manifests a congressional intent to give the EPA a secondary enforcement right in those cases where a

state has been authorized to act that is triggered ... if the state fails to initiate an enforcement action."[23] *Flanagan*'s summation is correct: "[T]he position of the Eighth Circuit in *Browner* is not that the federal government loses its civil enforcement power after a state program is authorized. The Eighth Circuit concludes only that the federal government loses its *primary role* in enforcing hazardous waste regulations."[24] Thus understood, *Browner* does not support Elias's contention that federal law is supplanted or that the United States lacks power to try him.[25]

Legislative history also supports the EPA's contention that RCRA's criminal enforcement provisions are meant to apply within states having authorized programs, as the First Circuit held in *MacDonald:*

> Prior to the 1984 RCRA Amendments-when, as today, RCRA provided for state programs which, when federally approved, would be carried out "in lieu" of the federal program, and which authorized the state to issue and enforce permits-the federal penal statute preceding § 6928(d) was worded so as to apply in so many words to violations both of federal and state permitting programs. Thus, the earlier version provided:
>
> Any person who knowingly—
>
> > (1) transports any hazardous waste identified or listed under this subchapter to a facility which does not

---

**16.** *Id.* at 1287–88 (quoting *Wyckoff,* 796 F.2d at 1200).

**17.** 191 F.3d 894 (8th Cir.1999).

**18.** *Id.* at 899.

**19.** *Id.* at 897.

**20.** *Id.* at 897–98 (quoting 42 U.S.C. § 6926(d)) (alterations in original).

**21.** *Id.* at 900.

**22.** *Flanagan,* 126 F.Supp.2d at 1289.

**23.** *Browner,* 191 F.3d at 899.

**24.** *Flanagan,* 126 F.Supp.2d at 1289 n. 3.

**25.** *Browner* is also suspect for its marked lack of *Chevron* deference.

have a permit under section 3005 of this title (or section 3006[26] of this title in case of a State program),

. . . . .

shall, upon conviction, be subject to a fine of not more than $25,000 for each day of violation, or to imprisonment not to exceed one year, or both.

The 1984 amendments increased the applicable criminal penalties and simply substituted "under this subchapter" for the references to the specific subsections under which permits, federal and state, may be granted. The new language, "without a permit under this subchapter," subsumed both state and federal permits, as both types are provided for within "this subchapter." The latter did not, therefore, in any way narrow the scope of federal criminal jurisdiction. Nor did the legislative record hint at any intention by Congress to narrow the scope of federal criminal jurisdiction. To the contrary, Congress manifested its desire to retain a strong federal presence.[27] Had Congress intended to impose a hitherto unknown limitation upon the scope of its laws criminalizing permit

violations, its intentions would surely have been manifested; for example, § 6928(d) would have been reworded to indicate that it applied only to persons in states lacking an authorized state program.[28]

■ For these reasons, we conclude that, under RCRA, the federal government retains both its criminal and its civil enforcement powers. Contrary to the district court's conclusion, this is true even where a state law counterpart exists, for many of these "counterparts" provide only misdemeanor punishments where federal law prescribes a felony. We believe RCRA only contemplates that the federal permitting scheme is supplanted by authorized state ones.[29] Thus, the federal proscription against transporting hazardous waste without a permit remains, as does the federal penalty for it. What changes, and what is supplanted by state law, is the definition of hazardous waste and the sovereign from whom generators must obtain the necessary permit originally—in this case, Idaho.[30]

■ Although the district court's reasoning diverged, it arrived at the same

26. Section 3006 of RCRA is codified at 42 U.S.C. § 6926.

27. Here the *MacDonald* opinion refers to H.R. Conf. Rep. No. 98–1133, 98th Cong., 2d Sess., Oct. 3, 1984 at 110, reprinted in 1984 U.S. Cong. & Admin. News 5681 and S.Rep. No. 98–284, 98th Cong., 1st Sess., Oct. 28, 1983 at 45, which states that "The Federal government's ability to obtain criminal penalties against generators and other persons who knowingly cause the transportation of hazardous waste to an unpermitted facility is essential to the regulatory scheme." *MacDonald*, 933 F.2d at 45.

28. *MacDonald*, 933 F.2d at 44–45 (internal quotation marks and citations omitted).

29. *See United States Dep't of Energy v. Ohio*, 503 U.S. 607, 611, 112 S.Ct. 1627, 118

L.Ed.2d 255 (1992) (noting that "permit program[s]" run by EPA are "subject to displacement by an adequate state counterpart"). Elias's argument that *Ohio* implicitly overruled *MacDonald* is not persuasive. Whether displacement of the EPA's permit program also functions to displace federal criminal enforcement under § 6928(d) was not an issue presented to or resolved by the *Ohio* court.

30. This interpretation does not render the "in lieu of" language meaningless. "Once the EPA authorizes a state program pursuant to Section 6926(b): (1) the EPA ceases issuing permits pursuant to its permit program; (2) the EPA's regulations, for example those respecting the characterization of solid wastes as hazardous and non-hazardous, are supplanted; and (3) the state assumes its position as the primary enforcement authority." *Flanagan*, 126 F.Supp.2d at 1292.

result. We therefore affirm the district court's refusal to dismiss Counts I, II, and III. Although we agree with the Government that the district court erred when it ordered post-trial that Elias's indictment be amended to reflect that he was charged in Counts II and III under Idaho Code § 39–4408(1), we hold that the error was harmless.[31] Neither party was misled, the trial was conducted on the basis of federal law, and in any subsequent prosecution, the judgment of conviction, which states violations of federal law, would control.

## B. *Representativeness of the Sample*

■ To obtain convictions on Counts I, II, and III, the Government had to prove that Elias transported or disposed of "hazardous waste."[32] The governing regulations provide that "hazardous waste" includes wastes that exhibit the characteristic of reactivity[33] and that "[a] solid waste exhibits the characteristic of reactivity if a representative sample of [it] . . . is a cyanide or sulfide bearing waste which, when exposed to pH conditions between 2 and 12.5, can generate toxic gases, vapors or fumes in a quantity sufficient to present a danger to human health or the environment."[34] A "representative sample" is "a sample of a universe or whole (e.g., waste pile, lagoon, ground water) which can be expected to exhibit the average properties of the universe or whole."[35]

■ Elias argues that there was insufficient evidence for the jury to convict him of disposing of "hazardous waste" because the Government presented no evidence that the samples it took from a three-foot radius inside the tank and from outside the tank exhibited the average properties of the entire tank. This analysis misses the mark for two reasons. First, it assumes that to prove Elias guilty of disposing of hazardous waste, the Government had to prove that the entire tank was hazardous. That is incorrect. As the EPA's Environmental Appeals Board explained in *In re Electric Service Co.*,[36]

> proof of the disposal violations does not hinge on accurately describing the condition or quality of some larger body. Instead, it hinges on proof of an uncontrolled discharge. . . . Under such circumstances, the sample itself is the uncontrolled discharge, the improper disposal, or, so to speak, the corpus delicti. Therefore, the violations may be established by simply proving two things: (1) that the samples themselves contain [reactive cyanide]; and (2) that the [reactive cyanide] w[as] not disposed of properly, a conclusion which may be inferred from where the [samples] were found.[37]

In this case, EPA investigators took at least one sample from sludge located outside the tank. By definition, therefore, this sludge sample had been disposed of.[38] It was reactive and tested positive for

---

31. Neither that section nor its federal analog, 42 U.S.C. § 6925(a), are criminal offenses of which one may be convicted.

32. *See* 42 U.S.C. § 6928(d) and (e).

33. 40 C.F.R. §§ 261.3(a)(2), 261.20–24.

34. 40 C.F.R. § 261.23.

35. 40 C.F.R. § 260.10.

36. 1 E.A.D. 947 (Env.App. Bd.1985), available at 1985 WL 57155.

37. *Id.*

38. *See* 40 C.F.R. § 260.10 ("Disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land . . . so that such solid waste or hazardous waste or any constituent thereof may enter the environment. . . .").

cyanide. No further evidence is necessary. Thus, whether this hazardous sludge sample bears the same characteristics of the tank waste Dominguez had not yet gotten to before he collapsed is legally beside the point.

On a more basic level, we think Elias's hypertechnical interpretation contravenes common sense. As the Government's witness, Dr. Lowery, explained, if the Government or a waste generator is trying to prove the negative, i.e., that cyanide is not present, relying on just one or two samples would be dangerous. Rather, the generator would need to do the more extensive sampling contemplated by the regulations to guard against obtaining a false negative from potentially striated waste. By contrast, if the Government is trying to prove a positive, i.e., that there is cyanide within, "it's not necessary to go to every inch of the tank to see if there's more cyanide there."

This explanation, which the EPA has advanced elsewhere,[39] makes perfect sense. If a sample from one part of the tank contains wastes reactive enough to cause brain damage to someone, there can be no conceivable purpose in sending other people into the tank to extract more samples. Indeed, under these circumstances, retrieving additional samples would actually disserve RCRA's objectives.[40] The district court did not err.

---

**39.** *See In re Hallar Enterprises, Inc.,* Docket No. RCRA–VI–815–H, 1999 WL 118257(EPA).

**40.** *See* 42 U.S.C. § 6902(a) (noting that RCRA's objective is to "promote the protection of health and the environment").

**41.** 40 C.F.R. 261.23(a).

**42.** *United States v. Weitzenhoff,* 35 F.3d 1275, 1289 (9th Cir.1993).

---

## C. *Constitutionally Adequate Notice*
### 1. *The governing regulation.*

 Elias also contends that the EPA regulation that defines what constitutes reactive hazardous waste is so vague as to deprive him of fair notice that his acts were proscribed and thus renders his convictions on these counts unconstitutional. The regulation, 40 C.F.R. § 261.23, provides as follows:

> A solid waste exhibits the characteristic of reactivity [and is thus hazardous waste] if a representative sample of the waste ... (5) is a cyanide ... bearing waste which, when exposed to pH conditions between 2 and 12.5, can generate toxic gases, vapors or fumes in a quantity sufficient to present a danger to human health or the environment.[41]

We review de novo whether this regulation is unconstitutionally vague.[42]

 The general rule is that "[a] criminal statute is not vague if it provides adequate notice in terms that a reasonable person of ordinary intelligence would understand that [his] conduct is prohibited."[43] However, "if the statutory prohibition involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them."[44]

---

**43.** *United States v. Martinez,* 49 F.3d 1398, 1403 (9th Cir.1995) (superseded by statute on other grounds).

**44.** *Weitzenhoff,* 35 F.3d at 1289 (internal quotation marks omitted) ("Weitzenhoff and Mariani were knowledgeable in the wastewater field and can be expected to have understood what the permit meant. In particular, they should have known that it did not give them license to dump thousands of gallons of par-

Title 40 C.F.R. § 261.23 indeed applies to "a select group of persons having specialized knowledge." Accordingly, to analyze whether this regulation is unconstitutionally vague, we must ask whether persons like Elias, whose businesses involve use, storage, and disposal of hazardous wastes, would have understood that the tank waste was reactive and thus hazardous. Because "in determining the sufficiency of the notice[,] a statute must of necessity be examined in the light of the conduct with which a defendant is charged," [45] the question becomes whether a reasonable person in the industry who knew the tank once contained cyanide and who had previously received health complaints from employees working in and around it would have known that the tank materials "presented a danger to human health or the environment." [46]

The district court considered this question carefully in response to Elias's motion to dismiss Counts I–III on void for vagueness grounds. After an evidentiary hearing on the motion, the court concluded that a reasonable person in the defendant's circumstances would have known of the "hazardous" nature of a substance without a numerically-quantified, test-based standard. We concur.

As the district court noted, the reactivity definition set forth in 40 C.F.R. § 261.23(a)(5) closely parallels the top three reactive classes of the National Fire Protection Agency, tracks the definition of reactive wastes used by the Chemical Manufacturers Association, and is substantially similar to the classification system

used by the United States Navy. The observation sandwiched in the middle seems most pertinent. If the people who make cyanide define reactivity (and thus hazardousness) this way, people who use it may be expected to do so also.

We have, moreover, sanctioned similar language before. For example, in *United States v. Kennecott Copper Corp.*,[47] we held that a law prohibiting "[t]he discharge of oil . . . into or upon the navigable waters of the United States . . . in harmful quantities" was not unconstitutionally vague.[48] We noted that its language, which was neither highly technical nor obscure, was sufficient to put persons on notice of potential criminal liability.[49] We see no reason why, if persons using or transporting oil can be charged with knowing what constitutes a "harmful quantity," persons using cyanide may not be charged with knowing how much cyanide, under certain conditions, may prove "harmful to human health or the environment."

### 2. *The SW–486 interim testing protocol.*

The district court concluded that it would be preferable to have some numerically-quantified, test-based standard for determining whether a substance releasing cyanide gas should be deemed hazardous but that this is not possible given the variety of situations and circumstances in which cyanide may exist and pose a hazard. Elias contends that quantifying reactivity is possible, and that, during the period in question, the EPA embraced a test that did precisely that. The test method-

tially treated sewage into the ocean on a regular basis.").

45. *United States v. E.C. Invs., Inc.*, 77 F.3d 327, 331–32 (9th Cir.1996) (internal quotations marks, alteration, and citation omitted).

46. 40 C.F.R. 261.23(a)(5).

47. 523 F.2d 821 (9th Cir.1975) (omissions in original).

48. *Id.*

49. *Id.* at 823.

ology to which Elias refers was first mentioned in an internal EPA memorandum dated July 12, 1985.[50] This memorandum from the Director of the Characterization and Assessment Division to Solid Waste Branch Chiefs provided as follows:

> Over the past year, we have received many inquiries about how to evaluate wastes for reactivity (§ 261.23(a)(5)). We have initiated a number of studies in this area, and expect to propose a quantitative threshold for toxic gas generation reactivity in December of this year. On an interim basis, however, we feel strongly that wastes releasing more than the following levels of toxic gas should be regulated as hazardous wastes:
>
> Total Available Cyanide: 250 mg HCN/Kg waste
>
> . . . . .
>
> The available cyanide ... should be measured using the attached draft testing method. Work currently being done ... may result in significant changes in the subsequent proposed test. However, pending the conclusion of investigations, we recommend use of this draft procedure.[51]

December of 1985 came and went without the EPA ever finalizing a quantitative testing methodology. However, the interim threshold (250 mg HCN/Kg waste) and the draft testing methodology was republished in EPA publication SW–846, which is entitled "Test Methods for Evaluating Solid Waste, Volume IC: Laboratory Manual Physical/Chemical Methods." [52] Although the manual was "intended to provide a unified, up-to-date source of information on sampling and analysis related to compliance with RCRA regulations," it also warned that it could not always be used "in rote fashion." [53] It explained that some "situations ... will require a combination of technical abilities, using the manual as guidance rather than in a step-by-step, word-by-word fashion," and that this "burden on the user ... is unavoidable because of the variety of sampling and analytical conditions found in hazardous waste." [54]

The interim threshold and draft testing methodology remained in the SW–846 manual for thirteen years, until growing dissatisfaction with it prompted the EPA to remove it.[55] It is undisputed that Elias did not know of the interim test's existence in 1996, when he ordered his employees to clean the tank. Nonetheless, Elias argues that because the waste in his tank would have passed the SW–486 test with flying

50. Memorandum from Eileen Claussen, Director, Environmental Protection Agency Characterization & Assessment Division to Solid Waste Branch Chiefs on "Interim Thresholds for Toxic Gas Generation Reactivity (261.23(a)(5))," (July 12, 1985).

51. *Id.*

52. Environmental Protection Agency, Office of Solid Waste and Emergency Response, *Test Methods for Evaluating Solid Waste; Volume IC: Laboratory Manual Physical/Chemical Methods,* SW–846, § 7.3.3 (1986).

53. *Id.* at 1.

54. *Id.*

55. *See, e.g.,* Joe Lowery, Chief, Chemistry Branch, Environmental Protection Agency, "Releasable Cyanide; Dysfunctional Regulation" (paper presented at 8th Annual Waste Testing & Quality Assurance Symposium, Arlington, VA, July 13–17, 1992, urging withdrawal or modification of SW–846 guidance); Memorandum from Diana Love, Director, EPA National Enforcement Investigations Center to David Brussard, Director, EPA Hazardous Waste Identification Division, OSWER (Feb. 18, 1998) (urging the Office of Solid Waste to withdraw guidance); Memorandum from David Brussard to Diana Love (April 1998) (withdrawing guidance).

colors and that without that test, the regulation gives him no guidance at all, he lacked fair notice that the material in the tank was in fact "hazardous."

We reject this argument. As noted above, at the end of the day, the question is whether a reasonable person who knew cyanide had previously been stored in the tank and who was aware of previous health complaints by those working with or near the substance would have known that the sludge in Elias's tank was dangerous to human health. The uncontroverted evidence is that they would have—despite the apparent vagueness of the terminology, those in the industry apparently understand what it means. Thus, even without the guidance of the SW–486 test, 40 C.F.R. § 261.23(a)(5) is not unconstitutionally vague.

Even if we presume that, unlike Elias, a reasonable person in the industry would have known of the interim testing protocol, it does not follow that he or she would have been so confused by the interplay between the regulation and the SW–486 test as to lack fair notice of what is hazardous. As the district court concluded, the interim threshold did not provide a "safe harbor" for waste that emitted toxic gas below the threshold level. It did not purport to tell waste generators a level *below which* their substances were non-hazardous; it simply told them a level *above which* they definitely were: "On an interim basis ... we feel strongly that wastes

releasing more than the following levels of toxic gas should be regulated as hazardous wastes." [56]

## D. *Mens Rea* Instruction

■■■■■ Elias argues that we must reverse his convictions because Jury Instruction 26 misstated the *mens rea* applicable to his offenses. Whether a jury instruction misstated elements of a statutory crime is a question of law the court normally reviews de novo.[57] However,

> [d]e novo review ... is only available when a proper objection has been made in the district court. Federal Rule of Criminal Procedure 30 prohibits a party from assigning error unless that party objects thereto before the jury retires to consider the verdict, stating *distinctly* the matter to which that party objects and the *grounds* of that objection.[58]

■■■■■ Elias failed to make such a distinct objection. He did object to the court's failure to give his proposed jury instructions and "to the Court's instructions that are being given to the extent they are inconsistent with the ones that we have submitted." [59] As this court held in *United States v. Klinger*,[60] however, such a global objection is simply not enough: "Rule 30 ... requires that a defendant object with adequate specificity—an objection must state distinctly the matter to which the party objects as well as the

56. Memorandum from Eileen Claussen, Director, Environmental Protection Agency Characterization & Assessment Division to Solid Waste Branch Chiefs on "Interim Thresholds for Toxic Gas Generation Reactivity (261.23(a)(5))," (July 12, 1985).

57. *United States v. Armstrong*, 909 F.2d 1238, 1243 (9th Cir.1990).

58. *Id.* at 1243 (internal quotation marks omitted).

59. Elias's counsel then went on to make several specific objections to particular instructions and/or omissions. Ironically, the Government specifically objected to Jury Instruction 26, arguing that the court should have included even more language than it ultimately did. It did so, moreover, immediately before Elias had an opportunity to state his objections.

60. 128 F.3d 705 (9th Cir.1997).

grounds of the objection. A defendant's mere proposal of an alternate instruction does not satisfy Rule 30's standard of specificity." [61] Because Elias failed to properly object to Jury Instruction 26, we review his objection to it for plain error.[62]

 The instruction provided as follows:

In determining whether the defendant knew that his conduct placed another person in imminent danger of death or serious bodily injury, you are instructed that a person's state of mind is knowing with respect to (A) his·conduct, if he is aware of the nature of his conduct; (B) an existing circumstance, if he is aware or believes that the circumstance exists; or (C) a result of his conduct, if he is aware or believes that his conduct is substantially certain to cause danger of death or serious bodily injury.

· · · · ·

The government does not need to show that the defendant actually intended to harm or endanger any person.

Elias objects to the very last sentence. He asserts that telling the jury he did not have to "actually intend[ ]" harm likely confused the jury because, according to his reading of the Restatement (Second) of Torts, "knowledge that there is a 'substantial certainty' that a given result will occur as a result of one's conduct is equated under the tort law with 'intention' to achieve that result." [63] He notes, too, that according to La Buy's Manual of Jury

Instructions in Federal Criminal Cases, the law has long recognized that "[i]n determining defendant's intention, the law assumes that every person intends the natural consequences of his voluntary acts or omissions." [64] Thus, Elias argues that the last part of Jury Instruction 26 told the jury that the Government did not have to prove the very thing the first part told them it did.

Although there is potential for confusion here, it does not rise to the level of plain error because it is confusion that would only afflict law students or lawyers. The jury was not instructed on the Second Restatement of Torts. Nor was it apprized of the principle that intent equals the natural consequences of voluntary acts. Indeed, intent was not defined at all.[65] For this reason, we must assume that the jury understood "intend" to mean what the dictionary says it does: "to have in mind as a design or purpose." [66] So understood, there is no conflict between the two parts of the instruction. The first part set the bar. The jury had to find that Elias believed his conduct was "substantially certain to cause danger or death or serious bodily injury." The second part told the jury that Elias didn't have to have ordered his workers into the tank for the "design or purpose" of hurting them. In other words, harming the workers did not have to have been Elias's objective in order for him to be guilty as charged. While this instruction is not a model of clarity, and

**61.** *Id.* at 710 (internal quotation marks, alteration, and citations omitted). The court stated that "Klinger's mere proposal of an alternate definition of 'knowingly' was inadequate to preserve the challenge he now makes on appeal." *Id.* at 711.

**62.** *Id.* at 710.

**63.** Restatement (Second) of Torts § 825, § 8A.

**64.** W. La Buy, Manual of Jury Instructions in Federal Criminal Cases § 403 (1963), *reprinted in* 33 F.R.D. 523 (1963).

**65.** Elias did not request a specific definition of intent.

**66.** Webster's Third New Int'l Dictionary 1175 (1986).

we would not advise its use in the future, it was not plainly erroneous.

### E. *Juror Bias and Perceived Jury Tampering*

The jury convicted Elias on May 7, 1999. On June 16, 1999, the Government prosecutors conducted a telephone conference with the jury foreperson, Boyd Greenlee, to discuss the trial. During that conference, Greenlee told the prosecutors that during the trial, he had heard from another juror, whom the parties later determined was alternate juror Scott, that Elias had approached her and asked her what it would take to buy her off. The prosecutors immediately informed the court of Greenlee's statements and notified defense counsel.

On July 2, 1999, the district court held the first of two evidentiary hearings on this matter. The hearing occurred in chambers with each of the available jurors called one at a time, placed under oath, and questioned by the court. During the court's questioning, Greenlee stated that during the "middle of the trial," another juror told her fellow jurors, including him, that Elias had "approached" her and asked her "what would it take to turn her decision." At another point in the court's questioning, Greenlee paraphrased the juror's accusation against Elias a bit differently: "She mentioned that [Elias] said what would it take to win your vote." When asked by the court, "what was your understanding as to the tone or nature of Mr. Elias' remark?" Greenlee responded, "I kind of think maybe he was just joking. I wasn't there, so I didn't hear. This is just hearsay." Seeking to clarify, the court asked Greenlee whether his understanding was that Elias's remark was "somewhat in jest," to which Greenlee replied that it was and that the juror who related it to him also perceived it that way:

"I think she didn't really feel totally uncomfortable about it."

Although none of the other jurors questioned by the court during the July 2, 1999, hearing recalled hearing Scott recount to them that Elias had approached her and asked her what it would take to "win" or "turn" her vote, the court erred on the side of caution and decided to have a more thorough evidentiary hearing, where counsel for both sides could examine the jurors. To accommodate all jurors, that hearing took place on January 3 and January 7, 2000.

During the second hearing, juror Scott testified that she had one chance meeting with Elias in the federal court parking lot, during which he had done nothing more than greet her. She did not recall whether she told other jurors about this greeting; she was adamant, however, that Elias had said nothing more than words to the effect of "hello" and that she had no recollection of him saying, jokingly or otherwise, anything along the lines of "what do I have to do to win your vote" or "what does a guy have to do to get out of this?" The district court found juror Scott "very credible on this point."

Greenlee also testified at the second hearing. He confirmed his previous testimony that a juror, whom he now remembered was juror Scott, related an incident to him and others in which Elias asked her what it would take to win her vote or sway her decision. Greenlee also testified that Scott indicated to him that Elias said this "jokingly" and was "not serious" and that he understood the purported comment that way as well. He asserted that after Scott revealed the encounter, "there was really nothing much said about it after that; that is about the extent of the conversation." The court then asked Greenlee whether what Scott told him about her contact with Elias distracted him or made it difficult for

him to concentrate on the evidence as he was listening to it in the courtroom. Greenlee replied, "No, it did not."

Burkhart was the only other juror to aver that he had heard reports of Scott's contact with Elias. Like Greenlee, however, Burkhart testified that he understood that Elias made the remark to Scott in a joking or jovial manner and that the jurors did not discuss the incident after Scott related it. Burkhart also testified that Elias's alleged remark did not scare him or distract him from the evidence and that at the time he heard the information from alternate juror Scott, he was able to remain fair and impartial in the case.

After hearing testimony from all jurors, the district court, in an order laying out detailed findings of fact, denied Elias's motion for a new trial based on jury tampering, juror misconduct, or juror bias. Among the court's most important findings were the following: Elias said nothing to Scott beyond a brief greeting or acknowledgment; specifically, he did not ask her anything along the lines of "what it would take to win [her] vote;" Scott told her fellow jurors of this greeting; Greenlee "misinterpreted Scott's comments to mean that Elias had asked Scott what it would take to 'win' or 'turn' her vote;" Burkhart misinterpreted Scott's comments to mean that Elias had asked Scott "what does a guy have to do to get out of this;" and finally, that both Greenlee and Burkhart interpreted Scott's comments to mean that Elias had made his comments to her in a joking manner. The court concluded that no juror believed Elias had tampered with the jury and that Elias had not shown any jurors were biased against him.

Elias argues that under Federal Rule of Evidence 606(b), it was improper for the judge to inquire into the juror's perceptions of the incident. However, in the context of a hearing about possible juror tampering, we have rejected the argument that "juror testimony about the effect of extraneous information or improper contacts on a juror's state of mind is prohibited." [67] We distinguished

> between testimony regarding the affected juror's mental processes in reaching the verdict-which is barred by Rule 606(b)-and testimony regarding a juror's more general fear and anxiety following a tampering incident, which is admissible for the purposes of determining whether there is a "reasonable possibility that the extraneous contact affected the verdict." [68]

Under this rationale, it was proper for the district court to question the jurors regarding their thoughts about the alleged tampering by Elias. While the judge ultimately found that there was in fact no tampering incident, this does not affect our decision to apply *Henley* because, at the time of the hearings, the allegation of tampering was both specific and serious. Thus, we hold that the evidentiary hearings did not result in impermissible inquiry into the jury's deliberative processes in violation of Federal Rule of Evidence 606(b).

"Because the district court held extensive evidentiary hearings and made findings of fact, we review the findings of fact to determine whether they are 'clearly erroneous.'" [69] There is no evidence that they are. By far, the most difficult thing to understand is how, if Scott merely said

**67.** *United States v. Henley,* 238 F.3d 1111, 1117 (9th Cir.2001)

**68.** *Id.* at 1118, *quoting United States v. Cheek,* 94 F.3d 136, 144 (4th Cir.1996).

**69.** *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.,* 206 F.3d 900, 911 (9th Cir.2000).

that Elias had greeted her, two people came to believe he had suggested a bribe, jokingly or otherwise. There is no satisfactory explanation. The fact remains, however, that both jurors testified that whatever they thought Elias had said, he had said jokingly. They testified that it did not preoccupy them at the time, frighten them, or distract them from focusing on the evidence. In light of this, the district court's conclusion that Elias had not borne his burden[70] of showing juror bias appears correct. Accordingly, we affirm the district court's denial of Elias's motion for a new trial.

### F. Restitution Order

The district court ordered Elias to pay $6.3 million in restitution to Dominguez. Elias argues that this constitutes plain error[71] because 18 U.S.C. § 3663[72] only authorizes imposition of restitution for violations of Title 18 and certain other provisions not applicable here, whereas his crimes were violations of Title 42. Because Elias is correct, we vacate the sentence in that respect and remand for entry of an amended judgment.

■ The jury convicted Elias of four counts. The first of these listed only 42 U.S.C. § 6928(e) as the relevant statute, so it cannot possibly support the imposition of restitution. By contrast, Counts II and III listed violations of both 18 U.S.C. § 2 and 42 U.S.C. § 6928(d)(2)(a). The reference to 18 U.S.C. § 2 likely explains why the district court thought imposing restitution was proper. In *United States v. Snider*,[73] however, this court held that "[t]he mention of [18 U.S.C. § 2] does not bring the restitution order within the ambit of [18 U.S.C. § 3663]" because "Section 2 does not establish 'an offense' of which a defendant may be convicted; it merely determines which offenders may be punished as principals."[74]

■ The Government asserts that even if the restitution order cannot be upheld on the basis of Counts II and III, it may be upheld on the basis of Count IV, the material misstatement count that alleged a violation of 18 U.S.C. § 1001. Although, as a theoretical matter, § 1001 offenses may support the imposition of restitution,[75] Elias's § 1001 offense cannot support the court's order of restitution for Dominguez because Dominguez was not a victim of that particular crime.[76] Elias did not harm Dominguez by lying; he harmed him

---

**70.** See *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir.1999) ("A defendant bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause.") (internal quotation marks and alteration omitted). See also *Dyer v. Calderon*, 151 F.3d 970, 975 (9th Cir.1998)(en banc) (reviewing state court's ruling on juror bias, en banc court stated that "[s]o long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.")

**71.** Elias failed to raise this issue before the trial court.

**72.** This section provides in relevant part:

The court, when sentencing a defendant convicted of an offense under this title, section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act ... or section 46312, 46502, or 46504 of title 49 ... may order ... that the defendant make restitution to any victim of such offense....

**73.** 957 F.2d 703 (9th Cir.1992).

**74.** *Id.* at 706.

**75.** See, e.g., *United States v. Hoover*, 175 F.3d 564, 569 (7th Cir.1999).

**76.** See *United States v. Rodrigues*, 229 F.3d 842, 845 (9th Cir.2000).

by knowingly exposing him to hazardous waste. This latter offense is one of the few for which Congress has not sanctioned the imposition of restitution. Perhaps this case will change that. At present, however, we conclude that the law does not sanction the imposition of restitution in this instance.

### III.

### CONCLUSION

For the reasons stated above, we AFFIRM in part, VACATE in part, and REMAND the case to the district court with instructions to amend the sentence by deleting the restitution provision. The district court may consider further amending the sentence by imposing a term of supervised release with a condition requiring restitution, pursuant to U.S. Sentencing Guidelines § 5E1.1(a)(2) (1995). In fulfilling the mandate of this remand, the court may hold such hearings and enter such orders as it deems appropriate. In all other respects, the judgment and sentence shall remain as written.

AFFIRMED in part, VACATED in part, and REMANDED.

### APPENDIX

42 U.S.C. § 6928. Federal enforcement

(a) Compliance orders.

(1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person has violated or is in violation of any requirement of this subchapter, the Administrator may issue an order assessing a civil penalty for any past or current violation, requiring compliance immediately or within a specified time period, or both, or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for ap-

propriate relief, including a temporary or permanent injunction.

. . . . .

(d) Criminal penalties. Any person who . . .

. . . . . .

(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter . . .

(A) without a permit under this subtitle . . .

(3) knowingly omits material information or makes any false material statement or representation in any application, label, manifest, record, report, permit, or other document filed, maintained, or used for purposes of compliance with regulations promulgated by the Administrator (or by a State in the case of an authorized State program) under this subchapter;

(4) knowingly generates, stores, treats, transports, disposes of, exports, or otherwise handles any hazardous waste or any used oil not identified or listed as a hazardous waste under this subchapter . . . and who knowingly destroys, alters, conceals, or fails to file any record, application, manifest, report, or other document required to be maintained or filed for purposes of compliance with regulations promulgated by the Administrator (or by a State in the case of an authorized State program) under this subchapter;

(5) knowingly transports without a manifest, or causes to be transported without a manifest, any hazardous waste or any used oil not identified or listed as a haz-

ardous waste under this subchapter required by regulations promulgated under this subchapter (or by a State in the case of a State program authorized under this subchapter) to be accompanied by a manifest ...

.　　.　　.　　.　　.

shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed two years (five years in the case of a violation of paragraph (1) or (2)), or both. If the conviction is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment under the respective paragraph shall be doubled with respect to both fine and imprisonment.

(e) Knowing endangerment.

Any person who knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter or used oil not identified or listed as a hazardous waste under this subchapter in violation of paragraph (1), (2), (3), (4), (5), (6), or (7) of subsection (d) of this section who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than fifteen years, or both.[77]