UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Vernon DUTKEL,
Defendant–Appellant.

No. 98–55338.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1998.

Decided Sept. 17, 1999.

Daniel A. Horowitz, Oakland, California, for the defendant-appellant.

Ellyn Marcus Lindsay, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: KOZINSKI and O'SCANNLAIN, Circuit Judges, and LOVELL,* District Judge.

Opinion by Judge KOZINSKI; Concurrence by Judge O'SCANNLAIN.

KOZINSKI, Circuit Judge:

Because impartial jurors are the cornerstone of our system of justice and central to the Sixth Amendment's promise of a fair trial, we "guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Remmer v. United States,* 350 U.S. 377, 382, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (*Remmer II* ). In Michael Dutkel's case, we didn't guard the jury jealously enough. During a joint trial on drug conspiracy and distribution charges, Dutkel's co-defendant, Eugene Washington, bribed a juror and secured himself a hung jury. The same jury convicted Dutkel. We consider what recourse a criminal defendant has when he learns that his co-defendant has tampered with the jury.

**I**

During the original trial, Washington employed two henchmen, Brandt Ellis and Leslie Mumphrey, to bribe and/or intimidate Felton Johnson, one of Dutkel and Washington's jurors. Early in the trial, Ellis approached Johnson outside the courthouse and told him that "the White guy [Dutkel] was guilty and that the Black guy was not guilty." Explaining that Washington was in trouble with the government regarding his taxes, Ellis told Johnson, "[w]e cannot afford the Black guy

to go to jail." Ellis and Mumphrey promised Johnson cash, a job and a new car if he voted to acquit Washington. They also mentioned Johnson's three-day-old daughter, intimated that they would follow him home and made it clear that they were monitoring his every move. As a consequence of these importunings, Johnson "freely talked about the case" with them. He spoke with them frequently during the trial, made daily reports about the jury's deliberations, gave them feedback for Washington's lawyers and assured them that he thought Dutkel was guilty and Washington was not. The jury eventually convicted Dutkel, and deadlocked as to Washington, with Johnson the lone holdout.

After serving more than half of his fifteen-year sentence, Dutkel learned of Washington's machinations when he stumbled across *United States v. Washington,* 66 F.3d 1101 (9th Cir.1995), an appeal from Washington's sentence for bribery and obstruction of justice. Soon thereafter, he filed a habeas petition under 28 U.S.C. § 2255, which the district court denied. Dutkel appeals.

**II**

 Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct. Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption. The Supreme Court has stated in categorical terms:

> In a criminal case, any ... tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to establish ... that such con-

---

* The Honorable Charles C. Lovell, United States District Judge for the District of Mon-

tana, sitting by designation.

tact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (*Remmer I*); *see also Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892). If the government fails to meet this burden at an evidentiary hearing, the defendant is entitled to have the verdict set aside. *See Remmer I,* 347 U.S. at 229–30, 74 S.Ct. 450; *United States v. Angulo,* 4 F.3d 843, 846–47 (9th Cir.1993).

The government argues that the categorical directive of *Remmer* has been undermined by subsequent cases which empower the district court to shift the burden of showing prejudice to the defendant. The cases on which the government relies do nothing of the sort, as none involved jury tampering as that term is normally understood: an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors. The cases on which the government relies involve more prosaic kinds of jury misconduct. *See United States v. Olano,* 507 U.S. 725, 729–30, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (presence of alternate jurors during jury deliberations); *Rushen v. Spain,* 464 U.S. 114, 116, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (juror's recollection of unrelated crime committed by defendant's associate); *Smith v. Phillips,* 455 U.S. 209, 212, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)

(juror's application for investigative position at District Attorney's Office during trial); *United States v. English,* 92 F.3d 909, 913–14 (9th Cir.1996) (elevator encounter between juror and victims); *United States v. Maree,* 934 F.2d 196, 202 (9th Cir.1991) (juror's contact with friends who encouraged her to convict defendant); *United States v. Madrid,* 842 F.2d 1090, 1092 (9th Cir.1988) (court clerk consoled juror after another juror swore at her). Jury tampering is a much more serious intrusion into the jury's processes and poses an inherently greater risk to the integrity of the verdict. While we presume that jurors will disregard the advice of friends and ignore other ex parte contacts, we can indulge no such presumption where jury tampering is involved. It is doubtless for that reason that the Supreme Court in *Remmer* announced a special rule dealing with jury tampering. We are in no position to second-guess the Supreme Court's judgment on this point, particularly in light of our own recent ruling in *Angulo,* 4 F.3d at 846, 848 (reaffirming *Remmer* presumption of prejudice in case where juror received threatening phone call).[1]

Three other circuits have recently spoken on this issue. The Fourth Circuit unhesitatingly retained the *Remmer* presumption in cases of jury tampering. *See United States v. Cheek,* 94 F.3d 136, 142

---

1. Judge O'Scannlain argues that *Remmer* was overruled or modified sub silencio by *Phillips.* See Concurring Op. at 900. We do not find this argument convincing, though it's possible that the Court today would reach a different result if faced with a case of jury tampering. *Cf. United States v. Gaudin,* 515 U.S. 506, 519–22, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (overruling *Sinclair v. United States,* 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929)). Moreover, we are bound by *Angulo,* which was decided well after *Phillips* and still treats *Remmer* as good law, despite Judge O'Scannlain's analysis to the contrary. While *Angulo* found that a multifactor test is appropriate to evaluate some allegations of jury misconduct or bias, it held that a hearing is necessary "[i]n cases where a *bribe* or a *threat to a juror* was communicated to the other

jurors...." *Angulo,* 4 F.3d at 847. *Angulo* thus draws a clear distinction between jury tampering and other kinds of juror misconduct. In a case of jury tampering such as ours, *Angulo* instructs that "the potential for bias is so strong" that a hearing must be held. *Id.* While the language used by the Supreme Court in *Remmer* could be read as going well beyond jury tampering to cover all manner of ex parte contacts with jurors, *see Remmer I,* 347 U.S. at 229, 74 S.Ct. 450, *Remmer* was a jury tampering case, and anything it said about other sorts of contacts with jurors is dicta overtaken by cases such as *Olano* and *Phillips.* These later cases, however, have no effect on *Remmer*'s holding as to jury tampering, as *Angulo* makes clear. Therefore, we are not free to follow the path of the concurrence, even if we were inclined to do so.

(4th Cir.1996). The D.C. Circuit in *United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir.1996), held that the *Remmer* presumption was not applicable, but it did so in a case involving exhortations from a juror's husband that she "nail" the defendants. *Id.* at 495. This is a run-of-the-mill ex parte contact case, where the burden rests on the defendant to show prejudice; it has nothing to do with jury tampering. *Williams–Davis* is thus a correct statement of the lesser scrutiny afforded to ordinary ex parte contacts, not a retreat from the *Remmer* presumption of prejudice in cases of jury tampering. Nothing in *Williams–Davis* suggests that the D.C. Circuit would fail to apply the *Remmer* presumption in a case where there was jury tampering.

Finally, in *United States v. Sylvester*, 143 F.3d 923 (5th Cir.1998), one juror received threatening phone calls and another was approached by a stranger seeking to talk about the case. The Fifth Circuit correctly identified this as jury tampering, but concluded that *Remmer* had been modified by *Olano* and *Phillips*. It therefore held that the district court had discretion to shift the burden of showing prejudice to the defendant. *See id.* at 934. For the reasons explained above, we do not believe that any of the Supreme Court's intervening opinions have spoken to the special case of jury tampering and we must therefore disagree with *Sylvester*.

### III

■ Having concluded that the *Remmer* presumption applies *if* the case involves jury tampering, we must still decide whether what occurred here amounted to tampering. There is no doubt that, as to Washington, Johnson was tampered with. Johnson's status vis-a-vis Dutkel is less clear. The government argues that Johnson was not bribed or coerced to vote one way or another as to Dutkel. While Dutkel was mentioned, the point of the bribe/intimidation was to get Johnson to acquit Washington, with his vote as to

Dutkel basically irrelevant. Indeed, during one of their encounters, Ellis told Johnson, "We don't care about Dutkel." We are also mindful of the presumption that jurors in joint trials will generally be able to "compartmentalize the evidence as it relates to separate defendants," and render a just verdict as to each. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.1980). Seen in this light, the communications between Washington's henchmen and Johnson were ordinary ex parte contacts, like those in *Olano* or *English*, and the burden would rest on Dutkel to demonstrate that he suffered prejudice. *See, e.g., Rushen*, 464 U.S. at 120–21, 104 S.Ct. 453; *Maree*, 934 F.2d at 202.

We do not believe that this is the correct view of the matter. *Remmer* holds that "[i]n a criminal case, any … tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is … deemed presumptively prejudicial…." *Remmer I*, 347 U.S. at 229, 74 S.Ct. 450. Dutkel's case falls squarely within the literal reading of this language: Ellis and Mumphrey tampered with Johnson, a juror, as to a matter pending before the jury-namely Washington's verdict. Our case differs from *Remmer*, however, because the object of the tampering was to influence the juror with respect to another defendant. This is a material difference, as there is no reason to believe that the Supreme Court had a situation like ours in mind when it used the broad language of *Remmer*.

We must therefore look to the concerns that animated the *Remmer* Court. Smith, a juror in Remmer's case, was approached during the trial by a third party, Satterly, who was acquainted with Remmer. Satterly mentioned to Smith—perhaps in jest, perhaps in earnest—that Remmer had obtained "about $300,000 under the table which he daresn't touch," and asked Smith, "Why don't you make a deal with him?" *Remmer II*, 350 U.S. at 380, 76 S.Ct. 425. Smith objected vigorously and nothing more was said. Nevertheless, "Smith was

disturbed," and reported the matter to the trial judge, who eventually called in the FBI. *Id.* Smith also mentioned the approach to two fellow jurors. In ordering a new trial, the Supreme Court in *Remmer II* focused on the fact that Smith had been "subjected to extraneous influences to which no juror should be subjected," and that this "may have influenced and disturbed Smith in the untrammeled exercise of his judgment as a juror." *Id.* at 382, 76 S.Ct. 425.

■ As we read *Remmer,* a presumption of prejudice arises if a juror was subjected to coercion or bribery, and if this intrusion may have affected the juror in the exercise of his judgment. Where the intrusion is (or is suspected to be) on behalf of the defendant raising the claim of prejudice, the presumption arises automatically because jurors will no doubt resent a defendant they believe has made an improper approach to them. The matter is more complicated where, as here, the intrusion is clearly made on behalf of another defendant. Under these circumstances, the question still is whether the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process. Once jury tampering by a co-defendant is established, the defendant must make a prima facie showing that the intrusion had such an adverse effect on the deliberations. Unless the district court finds that this showing is entirely frivolous or wholly implausible, it must order a *Remmer* hearing to explore the degree of the intrusion and likely prejudice suffered by the defendant.

We derive support for our conclusion from *Angulo.* In that case, a juror received an anonymous telephone call of a threatening nature during the course of trial. Though the caller did not refer to the trial or any of the defendants, the juror was "scared" and mentioned it to her fellow jurors and the trial judge. *See Angulo,* 4 F.3d at 846. Even though the judge removed the affected juror from the

panel, and the remaining jurors had not been subject to any direct threat or pressure, we held that there was jury tampering because "the remaining jury members may well have believed that defendants were responsible for the threat and, based on that assumption, may have decided the merits of the case on that basis." *Angulo,* 4 F.3d at 847. While *Angulo* is not directly on point, we read it for the proposition that even indirect coercive contacts that could affect the peace of mind of the jurors give rise to the *Remmer* presumption.

The only other circuit to address the issue reached the same conclusion. *See United States v. Cheek,* 94 F.3d 136 (4th Cir.1996). In *Cheek,* as in our case, one defendant in a joint trial surreptitiously contacted a juror. As with Dutkel, the tampering was done to benefit the one defendant, while the claim was raised by a co-defendant. Nevertheless, the Fourth Circuit concluded, as we do, that the co-defendant had properly raised a claim of jury tampering. *See id.* at 141.

## IV

Instead of determining whether Dutkel made out a prima facie case of jury tampering, the district court appears to have treated Dutkel's case as an ordinary ex parte contact case, stating that "[n]ot every improper ex parte contact results in a mistrial." Though the court apparently put the burden on the government to show that Dutkel was not prejudiced, its focus was not on the jury tampering, but on whether Ellis and Mumphrey's overtures introduced extraneous information into the jury room. It denied Dutkel's habeas petition because "the extraneous information communicated by Ellis and Mumphrey to juror Johnson did not have a substantial and injurious effect on or influence in determining the jury's verdict" as to Dutkel.

In this, the district court erred. As explained above, this is not a case involving a run-of-the-mill ex parte contact. Rather, this is a case of jury tampering, in

which Ellis and Mumphrey, through blandishments and coercion, successfully influenced Johnson's vote as to Washington. The first question the district court should have resolved is whether Dutkel made a prima facie showing that Ellis and Mumphrey's interactions with Johnson could have interfered with the jury's exercise of its functions vis-a-vis Dutkel. We think it clear that Dutkel did make such a showing. Ellis and Mumphrey mentioned Dutkel, if only by way of contrast, and some of their statements (e.g., "the White guy was guilty and ... the Black guy was not guilty") could have been construed as pressuring Johnson not only to acquit Washington, but also to convict Dutkel. For his part, Johnson did not merely assure Ellis and Mumphrey that he thought Washington was innocent, but also that he thought Dutkel was guilty. Was this Johnson's honest assessment, or an effort to give Ellis and Mumphrey what he thought they wanted? There is also evidence that Ellis and Mumphrey's repeated contacts with Johnson left him, like the jurors in *Remmer* and *Cheek*, a "disturbed and troubled man," deeply concerned about his own and his family's safety. *Remmer II*, 350 U.S. at 381, 76 S.Ct. 425; *Cheek*, 94 F.3d at 142. During the FBI investigation into Washington's jury tampering, several of the jurors reported that Johnson was distracted and expressed fear about his family, and Johnson himself stated that he was "very scared" by the contacts. Such worries may well have prevented Johnson from thinking about the evidence or paying attention to the judge's instructions. Further, Johnson actually yielded to the improper influence. This is not without significance. The jurors in *Remmer, Angulo* and *Cheek*-indeed in most jury tampering cases-disclosed the illicit contact and thus did not fear being discovered. By contrast, Johnson had to worry not only about threats to his family, but also about concealing his predicament from the court and his fellow jurors. It is possible that Johnson was hesitant about engaging in the normal give and take of deliberations, for fear of giving himself away.[2] Finally, Johnson gave Ellis and Mumphrey information about discussions in the jury room, and this information may have found its way back to Washington's lawyers. Such information may have been used to more effectively shift blame from Washington to Dutkel.[3]

In all these ways, and perhaps others, Johnson's participation as a juror in Dutkel's case may have been affected. Nor was the intrusion necessarily limited to Johnson, who may have spoken to other jurors about the bribe and/or threats, and they, in turn, may have suspected that Dutkel was responsible. *See Angulo,* 4 F.3d at 847. Moreover, the coercion could have altered Johnson's demeanor in the jury room, which may have affected the jury's collective decision-making or the overall tenor of deliberations. And, as we

2. One of Johnson's fellow jurors noted that Johnson was relatively silent during the deliberations as to Dutkel, and only began to speak up when the jury deliberated as to Washington.

3. There is no evidence that Washington's lawyers received or used any of the information that Ellis and Mumphrey extracted from Johnson. We presume that members of the bar would not knowingly use information obtained in this illicit fashion. Nevertheless, information could have been passed from Johnson, through Ellis and Mumphrey, to Washington, who then may have used this knowledge of how the jury perceived the case to influence certain strategic decisions made by his lawyers. We have no way of excluding this possibility. All we know is that Johnson passed information to Ellis and Mumphrey for the purpose of helping Washington's lawyers. As the FBI investigation revealed, "ELLIS wanted to know what WASHINGTON's attorney was doing wrong and what JOHNSON felt about the case." Government's Excerpt of Record at 55. "In addition to discussing whether anybody was guilty or innocent, [Ellis] wanted to know what the attorney was doing wrong. JOHNSON told [Ellis] that the female attorney was not doing her job to get WASHINGTON off of the conspiracy charge. As a result, she should have done some things differently." *Id.* at 48.

explained above, Johnson's disclosures about what was going on in the jury room may have filtered to Washington's lawyers and affected their strategy in ways that disadvantaged Dutkel. The issue, then, is not whether the jury was tainted by improper contacts or extraneous information; it is whether there is a reasonable possibility that the jury's deliberations as to Dutkel were influenced by the extraneous pressure exerted on Johnson.

"[T]he Supreme Court has stressed that the remedy for allegations of jury bias is a *hearing,* in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial." *Angulo,* 4 F.3d at 847 (citing *Remmer I,* 347 U.S. at 229–30, 74 S.Ct. 450). Although Dutkel did not press for a hearing below, his habeas petition addresses, if cursorily, the alternative of an evidentiary hearing.[4] Regardless, a specific request for a hearing is not necessary in a case of jury tampering. *See id.* at 848 ("[T]he only motion defendant need make to trigger the need for a hearing is a motion for a new trial or mistrial...."). Because Dutkel made a prima facie showing of jury tampering, "the district court was obliged to inquire as to the circumstances, [and] determine whether the affected jurors remained impartial." *Id.*

█ A *Remmer* hearing must begin with a strong presumption that the jury tampering affected the jury's decisionmaking as to Dutkel. The "burden rests heavily upon the Government" to prove otherwise. *Remmer I,* 347 U.S. at 229, 74 S.Ct. 450. The inquiry should focus on whether Ellis and Mumphrey's overtures affected Johnson's behavior-and the behavior of the other jurors-during deliberations. It should also focus on whether

information fed back by Johnson influenced Washington's defense to the detriment of Dutkel. In order to grant relief, the court need not conclude that the verdict as to Dutkel would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by the intrusion. In making this determination, the court may not inquire into any juror's mental processes, but rather must focus on conduct. *See Cheek,* 94 F.3d at 143–44 (citing Fed.R.Evid. 606(b)).

In performing this inquiry, the court must carefully consider the "entire picture" surrounding the tampering and its effects. *Remmer II,* 350 U.S. at 379, 76 S.Ct. 425; *see also Cheek,* 94 F.3d at 142. The government must show that there is no reasonable possibility that Johnson (or any other juror) "was ... affected in his freedom of action as a juror" as to Dutkel. *Remmer II,* 350 U.S. at 381, 76 S.Ct. 425. Unless the district court is convinced that there is no reasonable possibility that the deliberations as to Dutkel were affected by the tampering, the court must vacate Dutkel's conviction.

**REVERSED** and **REMANDED**.

O'SCANNLAIN, Circuit Judge, concurring in the result:

I concur in the result ordered by the court's opinion but not entirely in its legal analysis. I write separately to express my view that in criminal cases involving jury tampering by a co-defendant, the defendant must establish that prejudice *was likely* to have resulted before the government should be *required to prove the harmlessness of the intrusion. In this case, I agree we should reverse and remand for a harmlessness hearing because

4. Dutkel's primary argument below (as before us) is that the jury tampering in this case rises to the level of a structural error under *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and therefore gives rise to a conclusive presumption of prejudice. However, the Supreme Court clearly held in

*Remmer* that jury tampering raises only a rebuttable presumption of prejudice. *See Remmer I,* 347 U.S. at 229–30, 74 S.Ct. 450. The Supreme Court's holding in *Remmer* and our own decision in *Angulo* preclude us from accepting Dutkel's structural error argument.

Dutkel has presented evidence sufficient to establish that some prejudice to himself was a likely result of Washington's jury tampering. Nevertheless, I would leave the burden of proof with the defendant rather than shift it to the government.

The opinion places the burden of proof in jury tampering cases upon the government, requiring the government to "show that there is *no reasonable possibility* that [any juror] 'was ... affected in his freedom of action as a juror' as to [the defendant]." Op. at 899 (quoting *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 100 L.Ed. 435 (1956)) (*Remmer II*) (emphasis added). In allocating this burden to the government, the opinion relies heavily upon *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In *Remmer*, the Supreme Court stated that "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. 450.

In more recent cases, however, the Supreme Court has retreated from *Remmer*'s presumption of prejudice and the sweeping language of that opinion. In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the defendant argued that he was entitled to a new trial because of the possible partiality of a juror who had applied for a job in the prosecutor's office during the defendant's trial. The Court rejected his argument, explaining that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the *defendant* has the *opportunity* to prove actual bias." *Id.* at 215, 102 S.Ct. 940 (emphases added).[1] It is difficult to reconcile this language in *Phillips* with *Remmer*'s presumption of prejudice: "[A]ssuring the defendant 'an opportunity to prove actual bias' is out of synch with the *Remmer* presumption; why would a defendant enjoying a presumption in his favor need such an opportunity?" *United States v. Williams–Davis*, 90 F.3d 490, 496 (D.C.Cir.1996). Under *Phillips*, then, it would appear that the burden rests upon the *defendant* to prove prejudice in cases involving improper interference with the jury.

In *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court reversed the Ninth Circuit's holding that the defendant was entitled to a new trial because two alternate jurors were present in the jury room during deliberations. The *Olano* Court stated that "[t]here *may* be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* at 739, 113 S.Ct. 1770 (emphasis added and citations omitted). This language from *Olano*, deemphasizing the importance of presumptions of prejudice, seems inconsistent with *Remmer*'s categorical directive. *See Williams–Davis*, 90 F.3d at 496 ("[T]he *Olano* Court appeared to see *Remmer* largely as a case illustrating the importance of weighing the likelihood of prejudice rather than as a source of rigid rules.").

In sum, the Supreme Court's post-*Remmer* cases suggest that allegations of improper interference with jury deliberations should be addressed through case-specific investigation into the existence of actual prejudice, rather than automatic application of *Remmer*'s inflexible presumption. Our sister circuits have recognized the

---

1. *Phillips* was not a jury tampering case, as the opinion points out. *See* op. at 894–95. The *Phillips* Court explicitly referred to *Remmer*, however, as an example of a case "in which the defendant [was properly given] the opportunity to prove actual bias," 455 U.S. at 215, 102 S.Ct. 940. The *Phillips* Court's cita-

tion of *Remmer* suggests that its modification of the *Remmer* presumption extends to jury tampering cases. The majority's attempt to distinguish *Phillips* as applicable only to cases not involving jury tampering, *see* op. at 894–95, is difficult to sustain in light of *Phillips*'s express citation of *Remmer*.

Court's retreat from, or narrowing of, the *Remmer* presumption. *See United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) ("[T]he *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*."); *Williams–Davis*, 90 F.3d at 496–97 (noting language in *Phillips* that is "out of synch with the *Remmer* presumption," and pointing to *Olano*'s apparent "reconfigur[ation]" of *Remmer*).[2] While it is not our place to "second-guess" the Supreme Court, op. at 895, we certainly can—and must—follow the Court's modification of its own opinions. In light of *Phillips* and *Olano*, I would follow the Fifth and D.C. Circuits in holding that "only when the court determines that prejudice [from a suspected intrusion] is likely should the government be required to prove its absence." *Sylvester*, 143 F.3d at 934; *see also Williams–Davis*, 90 F.3d at 497 ("[T]he district court was correct under the Supreme Court's and our cases to inquire whether any particular intrusion showed enough of a 'likelihood of prejudice' to justify assigning the government a burden of proving harmlessness.").

Our own decision in *United States v. Angulo*, 4 F.3d 843 (9th Cir.1993), similarly recognizes that *Remmer* has been modified since being handed down over four decades ago. The court characterizes *Angulo* as "reaffirming" the *Remmer* presumption in a case of jury tampering, op. at 895; careful examination of *Angulo*, however, cannot support such analysis. Rather than reaffirming *Remmer*, *Angulo* subtly reconfigures the *Remmer* presumption, applying a flexible multifactor test in place of a pure *Remmer* analysis.

If the court's reading of *Angulo* were correct, one would expect *Angulo* to conduct a straightforward *Remmer* analysis like the one undertaken here. Such an analysis would contain the following three steps: (1) classification of the case as a jury tampering case, (2) application of the *Remmer* presumption, and (3) remand for an evidentiary hearing pursuant to *Remmer*. But the *Angulo* court proceeded down a different path. After briefly summarizing *Remmer, see Angulo*, 4 F.3d at 846, it noted that "not every improper ex parte contact with a juror requires a mistrial." *Id.* at 847. It further observed that "[a]n evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias." *Id.* The *Angulo* court then stated:

> [I]n determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source. *Considering these factors*, we deem it clear that the district court abused its discretion in failing to hold a hearing *under the facts presented in this case.*

*Id.* (emphases added and citation omitted). Thus, instead of undertaking a conventional *Remmer* analysis, the *Angulo* court applied a more flexible, multi-faceted test that led it to conclude that a hearing should have been held in light of the specific circumstances present in that case.

Although the *Angulo* test may produce results similar to a pure *Remmer* analysis in many (but not all) jury tampering cases, as an analytical matter the *Angulo* approach is clearly distinct from the court's application of the *Remmer* presumption here. A *Remmer* analysis calls upon courts to classify the type of interference presented and apply a presumption if jury tampering is involved. In contrast, the *Angulo* test focuses not on interference classification but on evaluation of "the seriousness of the alleged misconduct or bias," *Angulo*, 4 F.3d at 847. Thus the *Angulo* test is much closer to the views of the Fifth Circuit in *Sylvester* and the D.C. Circuit in *Williams–Davis* than it is to the

---

**2.** I am not persuaded by the Fourth Circuit's unqualified retention of the *Remmer* presumption in *United States v. Cheek*, 94 F.3d 136, 142 (4th Cir.1996). The *Cheek* opinion discusses neither *Phillips* nor *Olano*, suggesting that the *Cheek* court may have overlooked the possibility that these cases reconfigured *Remmer*.

approach taken by the court in this case. *See Sylvester*, 143 F.3d at 934 (calling for trial courts to "assess the severity of the suspected intrusion"); *Williams–Davis*, 90 F.3d at 497 (calling for trial courts to assess the "likelihood of prejudice" from an intrusion). While the outcome of *Angulo* might simulate the court's result, *Angulo*'s reasoning cannot bear the interpretation the court's analysis seeks to place upon it.

Like my colleagues, I reject Dutkel's argument that Washington's jury tampering constituted a structural error entitling Dutkel to a new trial. In light of the considerable evidence suggesting the likelihood of some prejudice to Dutkel, I agree that the district court erred by failing to hold a hearing to determine the harmlessness of Washington's jury tampering vis-a-vis Dutkel.[3] I part with the majority only to the extent that I would leave the burden of proof at such harmlessness hearing with Dutkel, giving him "the opportunity to prove actual bias" called for by *Phillips*.

**3.** The evidence suggesting the possible ways in which Dutkel may have been prejudiced by his co-defendant's jury tampering is amply discussed in the opinion, op. at 897–99, and therefore I do not repeat it here.